City Treasurer, Richard G. Oellers, to the use of the Commonwealth of Pennsylvania, *v.* H. C. Horn, executor of the estate of J. Rush Ritter, deceased.

*Theatrical licenses—Review of previous legislation respecting same.*

It would seem that the purpose of the act of June 24, 1895, was to codify the previous legislation upon the subject.

That legislation seems to show clearly that a tax although in form levied on a house, is not a tax on real estate, but on the trade, occupation or profession of players and showmen. This in the Pennsylvania tax system means a business with money returns, not a business done by one who works gratuitously. Amateur actors are not, therefore, taxed, and therefore the building in which they perform is not, since the tax on the building is simply a method of taxing the occupation.

The act of March 23, 1865, exempting from taxation representations by amateurs in Philadelphia and Pittsburg, the net proceeds of which are to be devoted to the relief of widows, etc., cannot be construed to impose a tax by implication on amateurs who may devote the proceeds of their representation to other purposes. Taxes are not imposed by implication.

*Theatre—Amateur performances do not constitute.* .

A single performance in a building of a play or drama, does not constitute such building a place for theatrical exhibitions or entertainments within the contemplation of the act of June 24, 1895, nor, would a succession of performances given by persons not professional players, even though the proceeds or profits of the exhibition were to be devoted to purposes other than those religious or charitable in their character and not to the pecuniary advantage of the participants.

*Theatre—Intent of act of June* 24, 1895, *P. L.* 249.

It was clearly the intent and purpose of the legislature in enacting the act of 1895 to impose a license fee upon places where plays were given by professional players, who played for compensation where the exhibition was given for personal profit, and it was not the intention of the legislature to impose this tax of $500 upon a building where theatrical performances were given by amateurs who were mere volunteers, for the purpose either of amusing themselves or others, even though there was a profit from such exhibition which was devoted to other than charitable purposes and not to their own use.

Argued Oct. 8, 1896.  Appeal, No. 59, Nov. T., 1896, by plaintiff, from judgment of C. P. Phila. Co., No 2, Dec. T., 1895, No. 327, on case stated in favor of defendant.  Before Rice, P. J., WILLARD, WICKHAM, BEAVER, REEDER, ORLADY and SMITH, JJ.  Affirmed.

Case stated to determine the status of a certain building as a theatre.  Before SULZBERGER, J.

The facts sufficiently appear in the opinion of the court below, which was as follows:

On November, 27, 1895, the defendant was the owner of a three-story building on Fortieth street, below Locust.  The first floor was divided into a reception hall, a cloak room, an office for the sale of tickets, and back of that a hall with a seating capacity, including balcony, of three hundred and twenty-eight persons. The hall was arranged with fixed folding chairs, similar to those used in theatres, a stage, a curtain, some scenery and dressing rooms for performers.  On the second floor there is a dancing room and balcony.  On the third floor there is a supper room and kitchen, with the necessary china and cooking utensils. The building is rented for social receptions, parties, dances, etc., for school exhibitions, festivals and like purposes.  On the day named the building was rented to and used by "The Garrick Club of the University of Pennsylvania" for the presentation of a play called "The Rivals," by Sheridan, the performers appearing in costume.

The Garrick Club is an organization composed of undergraduate students of the University, formed for the purpose of studying the English drama, the members contributing to the support of the organization by the payment of dues.  The play

was presented by the club under the patronage of a committee of ladies. Tickets were sold by members of the club to the public, and the proceeds were used to pay the rent of the building and the other expenses incurred in the production of the play; the profit, if any, being appropriated for the purpose of securing a suitable meeting place for the club. The persons taking part in the representation were all amateurs and members of the club; none of them received pay or compensation of any kind, nor did they derive any pecuniary benefit therefrom. No theatrical performances or operas are given in said building by any professional theatrical or operatic companies, nor by any professional players, nor by any persons who receive any pay or compensation for their services; but plays are occasionally given by amateur performers who do not follow the business of players and who receive no pay or compensation for their services, for the benefit of various charities, including those mentioned in the act of March 23, 1865, and also including other kinds of charities not mentioned in said act.

The plaintiff contends that on the foregoing agreed statement of facts the defendant is liable, under the act of June 24, 1895, P. L. 249, to pay to the commonwealth a license tax of $500 for the year beginning November 27, 1895. The defendant denies all liability.

The real question involved in the discussion is, whether the license tax in question is a tax on a profession, trade or occupation. If it be, the defendant is not liable, because persons associated for the study of the drama or for perfecting themselves in dress, manner or speech, are not, when so engaged without pay or profit, following a profession, trade or occupation which is taxable under the law.

To ascertain the nature of the tax imposed by the act of 1895, the previous legislation on the subject ought to be examined. Such an examination shows that there are two kinds of theatrical licenses in Pennsylvania; one, whose principal object is the supervision of the drama, and the other, whose sole purpose is to obtain revenue. The former is in the nature of a negative censorship, and is intended to forbid improper performances, without giving the right to modify or alter any proposed exhibition, and the latter is a mere tax on a profession, trade or occupation.

The right of issuing a license of the former kind appears to have been first exercised by Governor Hamilton, in 1754; but the opposition aroused by the playhouse so licensed caused the assembly to pass a bill to suppress lotteries and plays, and the governor signed it; but, being repealed by the king and council, a new theater was opened on June 25, 1759.

On March 10, 1779, the legislature passed an act concerning vice and immorality, in which was incorporated a provision against theatrical performances and shows of every kind. Notwithstanding the prohibition, a theater was opened on March 1, 1785, in which the true character of the performances was veiled under various thin disguises: Westcott's Phila., vol. 2, p. 965, et seq. On September 25, 1786, the legislature passed "An Act for the prevention of vice and immorality and of unlawful gaming, and to restrain disorderly sports and dissipation:" 2 Dallas's Laws, 474. The sixteenth section of this act rigidly forbade plays or parts of plays under penalties which were quite severe. Notwithstanding this, the "Lectures," "Tales," and other disguises for plays continued to be presented until, in 1789, the conflict of adroitness ended in a legislative battle.

A petition, signed by nineteen hundred citizens, was presented to the legislature, asking the repeal of the prohibition against theaters. A remonstrance, signed by thirty-three hundred and ten persons, was presented on the other side, which was met by counter petitions, signed by six thousand citizens, for the repeal, against four thousand, to which number the adversaries of the theater had by that time been augmented: Westcott, supra.

As the total population of the city of Philadelphia, the Northern Liberties and the District of Southwark, in 1790, was only 42,516 (Watson's Annals, vol. 2, p. 407), there may be a little doubt as to the genuineness of some of the signatures. At all events, the advocates of the theater prevailed, and on March 2, 1789, the legislature passed "An Act to repeal so much of an Act of General Assembly of this Commonwealth as prohibits dramatic entertainments within the City of Philadelphia and the neighborhood thereof:" 2 Dallas's Laws, 647. By the second section of this act, the prohibitory law of 1786 was repealed, so far as it related to the city of Philadelphia or the territory within one mile thereof. By the third section, the

president of the supreme executive council, the chief justice of the Supreme Court or the president of the court of common pleas for the county of Philadelphia, or any or either of them, were empowered, during three years from the passing of the act, to license such theatrical exhibitions only " as shall, in the opinion of him who shall grant such license, be unexceptionable." Presenting plays without a license was punished by fine and imprisonment. This general right of supervision still exists, though it is no longer exercisable by state officers.

By the nineteenth clause of the second section of the act of April 3, 1851, P. L. 320, entitled " An act regulating boroughs," the power was conferred on borough officers " to regulate and prohibit the exhibition of plays, shows, mountebanks, jugglers and all other exhibitions within the same."

By the act of May 5, 1876, P. L. 112, entitled " An act conferring additional powers upon the several boroughs and incorporated towns of this Commonwealth," this right was extended to every borough or incorporated town theretofore or thereafter incorporated.

By the first section of the act of May 22, 1879, P. L. 73, entitled " An act to regulate places of public amusement in cities of the first class," the mayor's previous license was made necessary before any representation can be given, and, before granting such license, it was made the mayor's duty to satisfy himself that the exhibition, performance or entertainment " shall not be immoral in its nature or tendencies, or otherwise unlawful or hurtful to the community." By the third section of this act the mayor is authorized to vacate and annul such license, if he be satisfied that any of the performances have been immoral or unlawful. For such a license the proprietor of the building must pay for the use of the city twenty-five dollars, and the same amount at each yearly renewal.

It would seem that all dramatic representations are subject to this supervision by the local authorities, and to the tax, by way of police regulation, connected therewith.

The act of June 24, 1895, P. L., 249, under which the defendant is sought to be made liable, provides for a license of quite a different character.

Its history is as follows : On April 15, 1834, an act of assembly was approved entitled " An act relating to county rates and

levies and township rates and levies : " P. L., 511.  By section 4 of this act the assessors were required to take an account of the names and surnames of all the taxable inhabitants, and also an account of certain kinds of real and personal property, as well as of " all offices and posts of· profit, professions, trades and occupations, and all single freemen above the age of twenty-one years who shall not follow any occupation or callings."  By section 25 of the same act the supervisors were authorized to lay a rate of assessment not exceeding one cent in the dollar upon real and personal estate, offices, trades and occupations.

By the 2d section of the act of June 11, 1840, P. L. 612, entitled " an act to create additional revenue to be applied towards the payment of interest and the extinguishment of the debts of the commonwealth," it was provided that the commissioners of each county should annually, until the year 1846 inclusive, add to the county rates and levies for the use of the commonwealth, upon all real and personal property, persons, trades, occupations and professions, made taxable by the laws of this commonwealth, for the purpose of raising county rates and levies, one mill upon every dollar of the actual value thereof.

By the act of May 4, 1841, P. L. 307, entitled " An act to provide revenue to meet the demands on the treasury, and for other purposes," a tax of one per cent was imposed on every dollar of the value above $200 of persons, trades, occupations and professions. By the 10th section of that act all sellers of goods and merchandise were first subjected to a license tax.

By the 32d section of the act of April 29, 1844, P. L. 486, entitled " An act to reduce the state debt, and to incorporate the Pennsylvania Canal & Railroad Company," it was provided that " salaries and emoluments of office, all offices, and posts of profit, professions, trades and occupations, except the occupation of farmers," shall be valued and assessed and subject to taxation for the purposes mentioned in the act.  By the 33d section of the same act the annual tax on trades, occupations and professions was fixed at one per cent upon every dollar of the value thereof above $200, all laws theretofore passed levying taxes for state purposes being repealed.

It will thus be seen that, from 1840 to 1844, the commonwealth had been endeavoring to reach the trades, occupations

and professions of men as sources of revenue. It is quite possible that theatrical performers were not easily reached by these acts. Perhaps the old prejudice against the legality of their business operated in their favor so far as to prevent the assessors from seriously considering their work as a trade, occupation or profession, viewing it rather in the light with which many persons at this day regard organ-grinders or bands of itinerant musicians. The business had, however become too important and respectable to escape taxation.

The second section of the "act to increase the revenue and diminish the legislative expenses of the commonwealth," passed April 16, 1845, P. L. 532, provided "that no theatrical exhibition or exhibitions of circus performances, or menageries, shall hereafter be allowed in this commonwealth without a license from the state." The rates were fixed as follows: $200 for Philadelphia county; $100 for Allegheny county, and $50.00 for any other county. It was further provided that the act should not exempt from payment of city or borough taxes. A license in any county authorized exhibitions in the others for one year, except that before a license obtained out of the counties of Philadelphia or Allegheny could be exercised in either of said counties, there was required the payment of such additional sum as would make the whole amount paid equal to the license tax in said counties respectively.

On April 10, 1849, "An act to create a sinking fund and to provide for the gradual and certain extinguishment of the debt of the commonwealth," was approved: P. L. 570. By the second section thereof, all revenues derived from certain specified sources were devoted to the sinking fund. Among them were "the taxes . . . . on theatrical, circus, and menagerie exhibitions." By the twenty-fourth section of the said act it was provided, "that hereafter the price of a theatre or circus license in the city or county of Philadelphia shall be $500, and in the county of Allegheny $200, and for every theatre or circus in any other county in this Commonwealth, $80.00."

A supplement to this act was approved on May 15, 1850, P. L. 772. By the fifth section of this supplement the license tax was fixed, for Philadelphia and Allegheny, as before; but the license in other counties was reduced to $50.00 The privilege to exhibit in any other than in the licensing county which

had been granted by the act of April 16, 1845, was taken away. The wording of the act was also changed in another manner, which has been deemed significant. Section 5 began thus: " That hereafter the price of a theatre or circus license, or museum, or any other place for theatrical representations shall be . . . ."

It has been said, in a case affirmed by the Supreme Court, that the use of the word " place " authorized the taxation of the building in Philadelphia and Allegheny counties : Hayes v. Coatesville Opera House Co., 8 C. C. 537 ; affirmed, 139 Pa. 636.

By the twelfth section of the act of April 14, 1851, P. L. 596, the proprietor or manager of a theatre, circus or menagerie, could obtain a license for the whole state for one year for $1,000.

The doubt whether the tax was on the players or on the building was set at rest by the act under which the commonwealth claims in this case. It is entitled " An act to provide for the licensing of buildings and other places in which theatrical, operatic or circus performances are held, and menageries or museums are exhibited, and fixing the prices to be paid for said licenses, and providing for the licensing of circuses and menageries exhibiting in tents and enclosures of like character," and was approved June 24, 1895 ; P. L. 249. By section 1, the owner or lessee of a building used for theatrical purposes must pay an annual license tax of $500 in cities of the first class, $400 in cities of the second class, $75.00 in cities of the third class, and $30.00 in all boroughs and townships. For exhibitions given in a tent or enclosure, the license is to be paid by the proprietor at the same rates as provided for a theatre building, but he may, for $1,000, receive a license for the whole state for one year. By section 2, the licenses provided for in the first section are to be in lieu of all licenses theretofore required to be paid for the use of the commonwealth. By section 3, city and borough taxes are saved, and by section 4, all inconsistent acts are repealed.

This act of June 24, 1895, is thus seen to be an amendment and codification of all the acts in force at the time of its passage. The main doubt which it was intended to remove was caused by the transformation of the theatrical business of the United States since 1860. Prior to that time, the rule was that resident players, called " stock companies," presented plays at the

same house during the whole year. Under this system the tax on the player's occupation or profession was laid with equal effect, whether it was directed against the person or the house.

After the year 1860, however, player companies became itinerant, remaining one or more days in one place, in large cities about a week, then proceeding elsewhere. If each of these companies had been compelled to pay a license of $500 for the county of Philadelphia, or $1,000 for a general state license, a large part of the theatrical enjoyment of the people of this city would have been taxed out of existence.

By virtue of the wording of the act of 1850, the taxing officers were enabled to interpret the law to mean that the house itself should pay $500 and no more. The act of June 24, 1895, declares and confirms this common understanding and usage.

The history of the legislation seems to show clearly that the tax in question, though in form levied on a house, is not a tax on real estate, but on the trade, occupation or profession of players and showmen. The term "trade, occupation or profession" in the Pennsylvania tax system, means a business with certain money value or returns, a fraction or percentage of which the state collects as taxes. A man who gratuitously does work which might have a value in money, and for which another person might demand and receive payment, may, so far as the advantage to the community is concerned, be following a trade, profession or occupation, but he is not doing so within the meaning of the tax laws. The case stated concedes that none of the players who appear in the defendant's building earn anything by their playing. Receiving no income from this source, they need pay no tax in this regard; and, as the tax on the building is evidently a way to tax the players, it follows that, if the players are exempt from the license tax, so is the building.

In view of the conclusion reached, it is not necessary to dwell long on the effect of the act of assembly of March 23, 1865, entitled "A supplement to an act to increase the revenues and diminish the legislative expenses of this commonwealth, approved the sixteenth day of April, 1845, and supplements thereto, relating to theatres or theatrical exhibitions." By the first and only section, it is enacted "That the provisions of the several acts, requiring a license from the state, for theatres or theatrical exhibitions, shall not be held to extend to any musi-

546 .OELLERS, Appellant, *v.* HORN.

Opinion of Court below—Opinion of the Court. [3 Pa. Superior Ct.

cal or dramatic representations, by amateurs, in the city of Philadelphia, or the city of Pittsburg, the net proceeds of which are to be devoted to the relief and support of widows or orphans, the wounded or the sick." If, prior to the passage of this act, amateurs playing without pay were not taxable, they could not thereafter be taxed without severely straining the language of this act. Its primary purpose was to assure certain amateurs who may have feared or doubted their liability. From such a purpose, it is not fair to conclude that the legislature intended to impose a tax on a class of persons not named in the act, nor apparently contemplated by its provisions, to wit, such amateurs, receiving no pay, who devoted their proceeds to purposes other than those named in the act. Taxes are not imposed by implication: Schuylkill Co. v. Township, 42 Pa. 21, 25.

In County of Erie v. City of Erie, 113 Pa. 360, Mr. Justice GREEN expressly held that, where the legislature had exempted certain property from taxation, other property not theretofore liable, upon which no taxation had been imposed, was not made taxable by reason of having been omitted from the exemption. And though Mr. Justice MITCHELL, in Phila. v. Barber, 160 Pa. 123, 128, intimated that Erie Co. v. Erie City, might require reconsideration, he expressly saved cases where the tax had never been imposed.

In our opinion, no tax has been imposed on the defendant for the use of the commonwealth.

Let judgment be entered for the defendant on the case stated.

*Error assigned* was entering judgment for defendant on a case stated.

*Geo. Bradford Carr*, for appellant.

*C. H. Eimerman*, with him *W. A. Manderson*, for appellee.

OPINION BY REEDER, J., February 16, 1897:

We can add but little to the able opinion of the learned judge of the court below, so far as it relates to the exhaustive history of the legislation upon this question, as well as the decisions relating thereto.

The case stated admits that but a single theatrical exhibition was ever given in the building owned by the defendant, and that one by the Garrick Club, a dramatic organization composed

of the students of the University of Pennsylvania, at which there was a price charged for admission, the profits from it to be appropriated to a fund for securing a suitable meeting place for the club.

The appellant claims that this charge for admission and the purpose to which the profits were to be applied, brings the owner of the building where the exhibition was given within the provision of the act of June 24, 1895.

That act provides, that the owner of a building "fitted up and used for theatrical exhibitions or entertainments or for the exhibition of museums," shall pay an annual license fee in cities of the first class of five hundred dollars.

The only question for the consideration of the court upon the case stated is, whether the facts contained therein bring this case within the provisions of the act of 1895. We agree with the learned judge of the court below that it does not.

A single performance in a building of a play or drama does not constitute such building a place for theatrical exhibitions or entertainments within the contemplation of the act of June 24, 1895, nor would a succession of performances given by persons not professional players, even though the proceeds or profits of the exhibition were to be devoted to purposes other than those. religious or charitable in their character, and not to the pecuniary advantage of the participants.

It was clearly the intent and purpose of the legislature in enacting the act of 1895, to impose a license fee upon places where plays were given by professional players, who played for compensation where the exhibition was given for personal profit, and it was not the intention of the legislature to impose this tax of five hundred dollars upon a building where theatrical performances were given by amateurs who were mere volunteers for the purpose either of amusing themselves or others, even though there was a profit from such exhibition which was devoted to other than charitable purposes, and not to their own use.

For this reason, and the reasons given by the court below in its able opinion, the judgment is affirmed.